IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 3:25-CR-05005-RK-01 |
| JEREMY WHITCHER, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court are Defendant Jeremy Whitcher's Pro Se Motions to Suppress. (Docs. 33, 37). The Government has filed its suggestions in opposition. (Doc. 39). Mr. Whitcher filed two documents titled as additional Motions to Suppress which the Court construes as replies to the Government's suggestions in opposition. (Docs. 41, 42). The Court held a hearing on this matter on November 12, 2025. (Doc. 62). The issue is now ripe for consideration. For the reasons that follow, it is recommended that the motions be DENIED.

### I. Findings of Fact

Based on the evidence presented at the hearing, the Court submits the following proposed findings of fact:

**A. Traffic Stop on March 17, 2023**

1. On March 17, 2023, Deputy Joseph Deras from the Jasper County Sherrif's Office ("JCSD") observed a red 2022 Dodge Ram truck driving down Interstate 44 at a high speed. (Tr. 4:3-10; Doc. 39 at 1).

2. Deputy Deras determined that the truck was traveling 100 miles per hour in a 70 mile per hour zone and initiated a traffic stop. (Tr. 4:7-10).

3. The driver of the vehicle was defendant Jeremy Whitcher. (Doc. 39 at 1; Tr. 4:19-20).

4. Deputy Deras began to issue a citation to Mr. Whitcher for speeding and was informed by dispatch that there was a warrant for Mr. Whitcher's arrest from Jasper County, Missouri. (Doc. 39 at 1-2; Tr. 5:14-25). Deputy Deras advised Mr. Whitcher of his outstanding warrant and asked him to step out of the vehicle. (Tr. 6:2-4).

5. Mr. Whitcher exited the vehicle, and Deputy Deras searched his person. (Tr. 6:5-6). During the pat down search, Deputy Deras found a large amount of U.S. currency in Mr. Whitcher's front pocket. (Tr. 6:8-11).

6. Mr. Whitcher's vehicle was stopped at the end of an on-ramp onto Interstate 44. (Doc. 39 at 2). Deputy Deras determined that the vehicle was creating a danger and needed to be moved. The passenger with Mr. Whitcher did not possess a valid driver's license and could not move the vehicle. (*Id.*; Tr. 6:12-20). Accordingly, Deputy Deras determined that the vehicle needed to be towed. (Doc. 39 at 2; Tr. 6:21-23).

7. Before the tow truck arrived at the scene, Deputy Deras began to conduct an inventory search of the vehicle in accordance with JCSD procedures. (Tr. 8:3-8).

8. As he began the inventory search, Deputy Deras found a clear zip lock bag with a crystal-like substance in plain view under the driver seat. (*Id.*). Based on his training and experience, he believed the substance to be methamphetamine. (*Id.*; Doc. 39 at 2). Deputy Deras searched the rest of the vehicle based on probable cause. (Tr. 8:7-13).

9. Deputy Deras did not complete an inventory sheet for the objects found in the vehicle. (Tr. 8:25-9:4).

10. The bag located under the driver's seat in Mr. Whitcher's vehicle contained approximately 117 grams of suspected methamphetamine. (Doc. 39 at 2). It was submitted to the Missouri State Highway Patrol Crime Laboratory for analysis, who determined the substance weighed 110.89 grams and contained methamphetamine. (*Id.*).

B. **Controlled Package Delivery on October 10, 2024**

11. On October 8, 2024, Louisville Metro Police Department ("LMPD") Sergeant Brandon Lincoln was at a United Parcel Service ("UPS") facility in Louisville, Kentucky, with his K-9. (Doc. 39 at 3). Sergeant Lincoln's K-9 is certified to detect narcotic odors. (*Id.*).

12. The K-9 alerted to indicate the presence of narcotics coming from a package sent from Los Angeles, California. (Doc. 39 at 2). The parcel was addressed to Mr. Whitcher's mother in Springfield, Missouri, with a return address in Los Angeles. (*Id.* at 2-3).

13. Sergeant Lincoln obtained a search warrant to open the parcel. (*Id.* at 3). The parcel contained a safe with approximately seven kilograms of a white crystal substance. (*Id.*). The substance was tested with a field test called TruNarc and it tested positive for methamphetamine. (*Id.*).

14. On October 10, 2024, the parcel was delivered to the Drug Enforcement Administration ("DEA") Resident Office in Springfield, Missouri. (*Id.*).

15. DEA Special Agent Jonathon Richards received the package and prepared it for a controlled delivery of the parcel. (*Id.*). SA Richards removed a representative sample of the methamphetamine and replaced it with fake methamphetamine. (*Id.*).

16. SA Richards obtained a federal search warrant to place a GPS tracking device inside the parcel. (*Id.*). He also obtained a federal anticipatory search warrant to search the defendant's mother's address in Springfield, Missouri. (*Id.*).

17. DEA agents began surveilling Mr. Whitcher's mother's address in Springfield. A Missouri State Highway Patrol Trooper placed the parcel on the front porch of the residence and it was brought inside. (*Id.*). Investigators then executed the anticipatory search warrant and seized the package. (*Id.*). No other contraband was located inside the residence. (*Id.*).

18. DEA agents obtained video surveillance from the UPS Store in Los Angeles, California, from October 7, 2024. (*Id.* at 4). Investigators identified Mr. Whitcher in the footage as the individual who shipped the parcel. (*Id.*).

**C. Traffic Stop on October 24, 2024**

19. On December 24, 2024, Missouri State Highway Patrol ("MSHP") Sergeant Tim Barrett observed a white Ford F350 traveling at 85 miles per hour in a 70 mile per hour zone on I-44. (*Id.* at 4).

20. Sergeant Barrett initiated a traffic stop and asked the driver, Mr. Whitcher, to step out of the vehicle. (*Id.*). As he did, Mr. Whitcher rolled up his window and locked the car. (*Id.*). Mr. Whitcher informed Sergeant Barrett that he had been in Tulsa, Oklahoma, earlier that day to pick up a horse trailer. (*Id.*).

21. Sergeant Barrett asked Mr. Whitcher for consent to search the vehicle, and Mr. Whitcher declined to give consent. (*Id.*). Sergeant Barrett had a K-9 dog conduct a sniff. (*Id.*). The K-9 alerted to the presence of narcotics in the vehicle. (*Id.*).

22. When Sergeant Barrett informed Mr. Whitcher that the K-9 had provided a positive alert, Mr. Whitcher refused to give the keys to Sergeant Barrett. (*Id.*). The two argued for several minutes before Mr. Whitcher gave his keys to Sergeant Barrett so he could search the vehicle. (*Id.*).

23. Upon searching the vehicle, Sergeant Barrett found two plastic bags containing a glass smoking pipe and approximately 1.38 ounces of a substance he suspected to be methamphetamine. (*Id.* at 5).

24. The substance was submitted to the MSHP Crime Laboratory and determined to be at least 29.9 grams of methamphetamine. (*Id.*).

## II. Discussion

On February 26, 2025, a federal grand jury in the Western District of Missouri returned a three-count indictment against Mr. Whitcher. (Doc. 1). Mr. Whitcher is charged with two counts of possession with intent to distribute 50 grams of methamphetamine (actual) and one count of possession with intent to distribute five grams or more of methamphetamine (actual). (*Id.*).

On April 25, 2025, defense counsel was appointed, the Court held Mr. Whitcher's Arraignment and Initial Appearance, and the Court entered a Scheduling and Trial Order. (Docs. 5, 6, 11). On June 10, 2025, the Court found an irreconcilable conflict existed and that there was a complete breakdown in communication between Mr. Whitcher and his appointed counsel. (Doc. 23). Mr. Whitcher was appointed new defense counsel. (Doc. 24). On August 29, 2025, after holding a *Faretta* hearing, this Court granted Mr. Whitcher's motion to proceed *pro se*. (Docs. 30-32).

On September 29, 2025, Mr. Whitcher filed his first motion seeking to suppress the evidence of a controlled delivery occurring on or between October 7, 2024, and October 10, 2024, which forms the basis of Count 2 of his indictment. (Doc. 33). The motion challenges the Government's chain of custody on the basis that all people who handled the evidence did not sign a chain of custody sheet in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and Federal Rules of Criminal Procedure 12(b)(3)(c) and 41. (Doc. 33

at 1). On October 1, 2025, Mr. Whitcher filed his second motion seeking to suppress evidence forming the basis of Count 1. (Doc. 37). The motion challenges the constitutionality of the search and seizure of Mr. Whitcher's vehicle on the basis that it violated his rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution and Federal Rules of Criminal Procedure 12(b)(3)(c) and 41. (Doc. 37 at 1). Mr. Whitcher argues in reply to the Government's suggestions in opposition that the evidence must be suppressed because the crime laboratory that analyzed the evidence did not perform a purity spectroscopy test and there was no field testing done. (Doc. 41 at 2; Doc. 42 at 2). The Government argues that the evidence should not be suppressed because the search of Mr. Whitcher's vehicle was lawful and chain-of-custody issues do not demand exclusion. (Doc. 39 at 7-11).

### A. Legal Standard

The Fourth Amendment mandates that "no Warrants shall issue…[unless] particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Cannon*, 703 F.3d 407, 412 (8th Cir. 2013) (citation omitted). If the police fail to abide by the Fourth Amendment, the exclusionary rule, a judicially prescribed remedial measure, "forbids the use of improperly obtained evidence at trial." *Martinez Carcamo v. Holder*, 713 F.3d 916, 922 (8th Cir. 2013) (quotation omitted). The exclusionary rule also governs "evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Tuton*, 893 F.3d 562, 568 (8th Cir. 2018) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

Police are authorized to impound automobiles which violate parking ordinances, jeopardize public safety, or impede the safe movement of traffic. *South Dakota v. Opperman*, 428

U.S. 364, 368-69 (1976). This authority "is beyond challenge." *Id.* When a vehicle is taken into police custody, the inventory search exception to the Fourth Amendment warrant requirement permits law enforcement to inventory its contents "even without a warrant or probable cause to search." *United States v. Garreau*, 658 F.3d 854, 857 (8th Cir. 2011) (citing *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011)). "Police may conduct a warrantless search of a lawfully-impounded vehicle even in the absence of probable cause." *United States v. Hall*, 497 F.3d 846, 850 (8th Cir. 2007) (citing *United States v. Kennedy*, 427 F.3d 1136, 1143 (8th Cir. 2005)). When taking custody of a suspect's vehicle, law enforcement officers "may conduct a warrantless search and inventory of the contents of the vehicle in order to protect the owner's property, to protect the police against claims of lost or stolen property, and to protect the police from potential danger." *United States v. Baldenegro-Valdez*, 703 F.3d 1117, 1125 (8th Cir. 2013) (citing *Colorado v. Bertine*, 479 U.S. 367, 372 (1987)). When police conduct an inventory search, "they may keep their eyes open for potentially incriminating items that they might discover, . . . as long as their sole purpose is not to investigate a crime." *United States v. Morris*, 915 F.3d 552, 557 (8th Cir. 2019) (quoting *United States v. Harris*, 795 F.3d 820, 822 (8th Cir. 2015)). "Armed with probable cause, law enforcement 'may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody.'" *United States v. Bettis*, 946 F.3d 1024, 1030 (8th Cir. 2020) (quoting *Michigan v. Thomas*, 485 U.S. 259, 261 (1982) (per curiam)).

A warrantless inventory search of a vehicle is valid if it is conducted pursuant to standardized police procedures and not done in bad faith or for the sole purpose of investigation. *Baldenegro-Valdez*, 703 F.3d at 1125-26; *Garreau*, 658 F.3d at 857. "Even if police fail to adhere to standardized procedures, the search is nevertheless reasonable provided it is not a pretext for an investigatory search." *United States v. Taylor*, 636 F.3d 461, 465 (8th Cir. 2011). Failure to follow

standardized procedures exactly is not enough to render an inventory search unreasonable, and there must be "something else" to suggest that the police raised "the inventory-search banner in an after-the-fact attempt to justify" a simple investigatory search for incriminating evidence. *United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003) (quoting *United States v. Marshall*, 986 F.2d 1171, 1175 (8th Cir. 1993)).

Defects in a chain of custody rarely require exclusion of evidence. "The chain of custody does not have to be perfect." *United States v. Johnson*, 688 F.3d 494, 505 (8th Cir. 2012). If there is a defect in the chain of custody, that issue goes to the weight given to the evidence, not its admissibility. *United States v. Edwards*, 111 F.4th 919, 923 (8th Cir. 2024) (citing *United States v. Moore*, 71 F.4th 678, 687 (8th Cir. 2023)). Chain-of-custody issues generally have "nothing to do with whether law enforcement violated the Fourth Amendment." *United States v. Tuttle*, No. 8:20-CR-141, 2023 WL 5017195, at *6 (D. Neb. Aug. 7, 2023) (citing *United States v. Manning*, 738 F.3d 937, 944 (8th Cir. 2014)).

**B. The search of Mr. Whitcher's vehicle was lawful.**

Mr. Whitcher argues that the search of his vehicle on March 17, 2023, was unsupported by probable cause. (Doc. 37 at 3). The Government argues that the search falls within the inventory search exception to the Fourth Amendment. (Doc. 39 at 10). The Court recommends a finding that the search of Mr. Whitcher's vehicle falls within the inventory search exception to the Fourth Amendment.

Police may search a lawfully impounded vehicle without a warrant even in the absence of probable cause. *Hall*, 497 F.3d at 850. For an inventory search to be reasonable, it must be in line with standardized police procedures in order to ensure that the search was not "a ruse for general rummaging in order to discover incriminating evidence." *United States v. Potter*, 125 F.4th 916,

919 (8th Cir. 2025) (internal citations omitted). The Jasper County Sheriff's Office Policy and Procedure states that a content inventory "is required for the towing and protective custody of vehicles." (Gov't Ex. 1 at 1). Vehicles will be towed when "[t]he driver of any vehicle is taken into custody by the Sheriff's Office and such vehicle would thereby be left unattended upon a street or highway." (*Id.* at 2). Vehicles will also be towed when "parked illegally or placed in such a manner as to constitute a hazard or obstruction to the movement of traffic." (*Id.*).

Mr. Whitcher was pulled over for exceeding the speed limit and subsequently arrested on an outstanding warrant. (Doc. 39-2 at 4). Upon his arrest, Mr. Whitcher's vehicle was parked on the on-ramp to the Interstate and presented a hazard to oncoming traffic. The passenger in Mr. Whitcher's vehicle at the time of his arrest did not have a valid driver's license and could not remove the vehicle from the scene. (*Id.*; Tr. 6:12-20). The policies of the Jasper County Sheriff's Department specifically permit vehicles to be towed when the driver is taken into custody and the vehicle would be left unattended. (Gov't Ex. 1 at 2). Therefore, it was standard police procedure for the Jasper County Sheriff's Officers to tow the vehicle. (*Id.* at 1). The Fourth Amendment permits officers to conduct an inventory search of vehicles they take into custody. *Potter*, 125 F.4th at 919 ("An inventory search conducted according to standardized police procedures is reasonable.").

Mr. Whitcher argues that since Deputy Deras did not complete the inventory form of his vehicle, a proper inventory search was not conducted, and the search of his vehicle was therefore unlawful. (Tr. 28:5-14). Deputy Deras did not complete an inventory search form pursuant to his search of Mr. Whitcher's vehicle. (Tr. 8:25-9:1-4). This is required under JCSD's tow policy. (Gov't Ex. 1 at 1) ("A content inventory will be conducted on all vehicles towed, unless otherwise instructed by a supervisor."). Deputy Deras testified that he did not complete the form because

when he found what he suspected to be methamphetamine in the vehicle, the search of the remainder of the vehicle was conducted pursuant to probable cause. (Tr. 8:3-8). The first thing Deputy Deras found in the car was the bag of methamphetamine under the seat. (*Id.*); *see Morris*, 915 F.3d at 557 (stating that police officers may "keep their eyes open" for incriminating evidence during an inventory search); *United States v. Beal*, 430 F.3d 950, 955 (8th Cir. 2005) (noting that discovery of "known precursors to the manufacture of methamphetamine" during an inventory search created probable cause to search the rest of the vehicle). Mr. Whitcher does not seek to suppress any evidence obtained after the search of the vehicle turned into a probable cause search. (*See* Docs. 33, 37).

Even though Deputy Deras did not fully comply with the standardized procedures prescribed by JCSD, there is no evidence that his beginning the inventory search was a pretext for an investigatory search. *See Taylor*, 636 F.3d at 465 ("Even if police fail to adhere to standardized procedures, the search is nevertheless reasonable provided it is not a pretext for an investigatory search."). There is no evidence that the search was "a ruse for general rummaging in order to discover incriminating evidence." *Kennedy*, 427 F.3d at 1143. No evidence presented at the hearing or in briefing suggests that Deputy Deras knew who Mr. Whitcher was before he pulled him over for driving 100 miles per hour in a seventy miles per hour zone. There is no "something else" indicating that law enforcement has raised the inventory search exception as an "after-the-fact attempt to justify" a search for incriminating evidence. *Rowland*, 341 F.3d at 780. Therefore, the inventory search of Mr. Whitcher's car that revealed the methamphetamine was reasonable and falls within the inventory search exception to the Fourth Amendment's warrant requirement.

Accordingly, this Court recommends the District Judge find that the search of Mr. Whitcher's vehicle did not violate the Fourth Amendment.

### C. Any defects in the chain-of-custody or forensic analysis of the drugs obtained from Mr. Whitcher's vehicle do not warrant suppression.

Mr. Whitcher argues that the October 2024 controlled delivery evidence must be suppressed because not everyone who handled the evidence signed a chain of custody sheet or followed proper procedure for shipping the evidence to the laboratory for testing. (Doc. 33 at 8-9; Tr. 29:24-30:25). The Government argues that this is an issue of evidentiary weight, not admissibility. (Doc. 39 at 7; Tr. 25:5-8, 27:1-7). The Court recommends a finding that the Fourth Amendment is not implicated by any alleged defects in the chain of custody.

Defects in a chain of custody rarely require exclusion of evidence. A defect in the chain of custody goes to the weight given to the evidence, not its admissibility. *Edwards*, 111 F.4th at 923. Chain-of-custody issues generally have "nothing to do with whether law enforcement violated the Fourth Amendment." *Tuttle*, 2023 WL 5017195, *6 (D. Neb. Aug. 7, 2023) (citing *Manning*, 738 F.3d at 944). Mr. Whitcher's claim is not a constitutional issue. Therefore, it is inappropriate for a motion to suppress.

Mr. Whitcher argues in reply that the evidence obtained from his car on two separate occasions (March 17, 2023, and December 24, 2024) must be suppressed because the MSHP did not perform a field test and because the MSHP Crime Laboratory did not perform an ultraviolet spectroscopy. (Doc. 42 at 2; Doc. 41 at 2; Tr. 33:19-24). The Court construes these as additional chain-of-custody arguments. Mr. Whitcher references *Gladden v. United States* as requiring suppression. (Doc. 42 at 2; Doc. 41 at 2). The Court reads this as a reference to *United States v. Gladden*, 349 F. Supp. 3d 465 (S.D.N.Y. 2019). In that case, the court did not provide the defendant with the relief that Mr. Whitcher seeks. *See id.* at 472-73 (holding that the absence of a lab report distinguishing whether the substance was "crack cocaine" or "cocaine" did not support the

defendant's claim for ineffective assistance of counsel). Additionally, this Court is not bound by a decision issued by the United States District Court for the Southern District of New York.

Further, arguments that the MSHP Crime Laboratory performed the wrong test or omitted a necessary test go to the weight of the evidence against Mr. Whitcher, not its admissibility. Mr. Whitcher's arguments and evidence regarding forensic testing in his case are better raised at trial than at a Suppression Hearing.

Therefore, this Court recommends the District Judge find that the Fourth Amendment is not implicated by any alleged defects in the chain of custody or the forensic analysis of the evidence against Mr. Whitcher.

### III.    Conclusion

For the foregoing reasons, IT IS RECOMMENDED that the District Judge, after making an independent review of the record and applicable law, enter an order DENYING Defendant Jeremy Whitcher's Pro Se Motions to Suppress.

Counsel are reminded that each party has fourteen (14) days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation that are accepted or adopted by the District Judge, except on the grounds of plain error or manifest injustice.

Dated this 14th day of November, 2025, at Jefferson City, Missouri.

*Willie J. Epps, Jr.*

Willie J. Epps, Jr.
Chief United States Magistrate Judge